**11-122-cv**
**WC Capital Mgmt. LLC v. UBS Sec. LLC**

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: July 18, 2012                    Decided: April 1, 2013)

Docket No. 11-122-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WC CAPITAL MANAGEMENT, LLC,

Plaintiff-Appellant,

WILLOW CREEK CAPITAL PARTNERS, L.P., a
Delaware Limited partnership, WILLOW CREEK
SHORT BIASED 30/130 FUND, L.P., a Delaware
Limited partnership,

Plaintiffs-Counter-Defendants-Appellants,

v.

UBS SECURITIES, LLC, a Delaware limited liability
company, UBS AG, a Swiss company,

Defendants-Counter-Claimants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LIVINGSTON, LOHIER, <u>Circuit Judges</u>, and RAKOFF, <u>District Judge</u>.[*]

---

[*] The Honorable Jed S. Rakoff, of the United States District Court for the Southern
District of New York, sitting by designation.

WC Capital Management, LLC, Willow Creek Capital Partners, L.P., and Willow Creek Short Biased 30/130 Fund, L.P. appeal from a judgment of the United States District Court for the Southern District of New York (Hellerstein, J.), granting UBS Securities, LLC and UBS AG's motion for judgment on the pleadings. Plaintiffs, who opened margin accounts with UBS, contend that UBS violated Securities and Exchange Commission Rule 10b-16 by failing to disclose its actual margin rules and by failing to provide written notice before it revised those margin rules. We conclude that UBS's disclosures here did not violate Rule 10b-16(a), which requires disclosure of a broker's policies regarding circumstances that may trigger a margin call, even though UBS did not expressly disclose the more complex formulas it employed to calculate plaintiffs' collateral requirements. We also conclude that UBS complied with Rule 10b-16(b), which does not require a broker to provide advance notice to customers before it changes its margin policies. Accordingly, we AFFIRM.

GEORGE DONALDSON (Anthony J. Harwood, New York, NY, on the brief), Law Offices of George Donaldson, Berkeley, CA, for Plaintiff-Appellant WC Capital Management, LLC, and Plaintiffs-Counter-Defendants-Appellants Willow Creek Capital Partners, L.P., and Willow Creek Short Biased 30/130 Fund, L.P.

DAVID C. BOHAN, Katten Muchin Rosenman LLP, Chicago, IL, for Defendants-Counter-Claimants-Appellees UBS Securities, LLC and UBS AG.

LOHIER, Circuit Judge:

We are asked to determine whether a broker's disclosures to its customers regarding margin maintenance requirements for margin accounts complied with Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-16, 17 C.F.R. § 240.10b-16, promulgated thereunder. WC Capital Management, LLC ("WC"), Willow Creek Capital Partners, L.P. ("WCCP"), and Willow Creek Short Biased 30/130 Fund, L.P. ("WCSB") (collectively, "Willow Creek") started this action against UBS Securities, LLC and UBS AG (together, "UBS"), claiming a violation of Rule 10b-16. Willow Creek claimed that UBS

violated Rule 10b-16 by failing to fully disclose its generally applicable margin rules until after it demanded that Willow Creek provide additional collateral for its margin account. Willow Creek also alleged that UBS failed to provide adequate notice before it revised those rules. The United States District Court for the Southern District of New York (Hellerstein, J.) granted UBS's motion for judgment on the pleadings, concluding that the initial disclosure statement provided by UBS satisfied Rule 10b-16's disclosure requirements.

We affirm. Under Rule 10b-16(a), a broker must disclose "conditions under which additional collateral can be required." Where, as here, a broker discloses its generally applicable margin policies regarding the circumstances that may lead it to reevaluate the adequacy of the collateral in a customer's account and also indicates that more specific information about its margin policies is available to the customer, it need not disclose the precise, complex formulas it uses to calculate its collateral requirements. Nor did Rule 10b-16(b) require UBS to provide advance notice to Willow Creek before it changed its margin rules. In affirming on these grounds, we need not, and do not, address whether customers have a private right of action under Rule 10b-16.

## BACKGROUND

Because Willow Creek appeals from an order dismissing the complaint on the pleadings, we accept as true the facts alleged in the complaint, Graziano v. Pataki, 689 F.3d 110, 114 (2d Cir. 2012), and we may consider documents incorporated into or integral to the complaint, L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011).

3

A. Facts

WC is the general partner and manager of WCCP and WCSB, two "long/short" investment partnerships that invest typically in the securities of companies with a market capitalization below $1 billion. In early 2007 UBS agreed to act as Willow Creek's prime broker to provide margin loans and prime brokerage services to WCCP and WCSB. Among other things, UBS maintained custody of WCCP's and WCSB's securities and cash collateral and provided them with loans on margin. Willow Creek relied on UBS's extension of margin credit to leverage its existing capital when acquiring securities. In return, Willow Creek paid UBS interest on the margin loans and other fees, including trading commissions.

The client account agreements between UBS and Willow Creek (the "Client Account Agreements"), dated January 12, 2007 and February 27, 2007, provided that UBS could demand additional collateral from Willow Creek during the course of their relationship. Specifically, the agreements stated that:

> [i]f at any time any of the UBS Entities has reasonable grounds for insecurity with respect to [Willow Creek's] performance of any of the Contracts or its Obligations, any of the UBS Entities may demand . . . adequate assurance of due performance by [Willow Creek] within 24 hours . . . . The adequate assurance of performance may include . . . the delivery by [Willow Creek] to [UBS] of additional property as Collateral.

The Client Account Agreements also required that Willow Creek "maintain in and furnish to the Accounts such margin . . . as is required by Applicable Law and such greater amounts as the UBS Entities may in their sole discretion require."

When Willow Creek opened its margin accounts, it received a document entitled "Disclosure Statement in Compliance with S.E.C. Rule 10b-16" (the "Initial Disclosure

4

Statement").[1]  The Initial Disclosure Statement explained that UBS had a security interest in the securities held in Willow Creek's margin accounts and discussed UBS's margin policies and the risks associated with margin accounts.  In particular, a section entitled "General Margin Policies" disclosed that UBS had "established certain 'in house' margin policies" that exceeded the margin requirements of the Federal Reserve Board and the Financial Industry Regulatory Authority, Inc. ("FINRA").[2]  The same section also contained the following language:

> It is [UBS]'s policy to review periodically any account as to which it has credit concerns in light of the value of the assets in the account . . . .  Each account with a debit balance is reviewed on an individual basis with consideration given to factors such as market conditions generally at the time, marketability of the securities in the account, frequency of the activity in the account, duration of the account and concentration of particular securities in the account.  Different weight may be given these factors by [UBS], and on the basis of its review, [UBS], in its sole discretion, may require additional collateral, above the amount required by the rules of the self regulatory agencies, as security for your obligations to [UBS].

Similarly, in a section entitled "Risks Associated with Margin Accounts," the Initial Disclosure Statement provided:

> [UBS] can increase its "house" maintenance margin requirements at any time and is not required to provide you with advance written notice.  These changes in [UBS] policy often take effect

_____

[1]  Willow Creek does not dispute that it received a copy of the Initial Disclosure Statement.

[2]  FINRA is a self-regulatory organization and national securities association that is registered with the Securities and Exchange Commission (the "SEC").  It is the successor entity to the National Association of Securities Dealers ("NASD") and "is responsible for conducting investigations and commencing disciplinary proceedings against FINRA member firms and their associated member representatives relating to compliance with the federal securities laws and regulations."  Fiero v. Fin. Indus. Regulatory Auth., Inc., 660 F.3d 569, 571 (2d Cir. 2011) (quotation marks and alteration omitted).

immediately and may result in the issuance of a maintenance margin call. Your failure to satisfy the call may cause the member to liquidate or sell securities in your account(s).

The Initial Disclosure Statement also explicitly requested that Willow Creek "consult [its] account representative for more specific information with respect to [UBS] general margin policies."

During a two-year period following the execution of the Client Account Agreements, WCCP and WCSB are alleged to have "performed in a superior fashion," while UBS earned "millions of dollars" from Willow Creek. In December 2008, however, UBS notified Willow Creek that WCCP's account was in the second day of a margin call for approximately $6.85 million. Two days later, UBS sent Willow Creek a new document entitled "Prime Broker Margin Levels" ("Margin Levels I"), which "provide[d] a description of the margin rules currently in use in the Prime Brokerage Unit of [UBS]." UBS told Willow Creek that the document "explains the margin rules applied to your account." Margin Levels I consisted of seven pages of detailed information regarding UBS's margin rules for various types of securities. The vast majority of the information in Margin Levels I involved a detailed description of internal margin guidelines in the form of complex formulas and tables that set out various multipliers and "margin add-ons" used by UBS to account for factors such as a portfolio's concentration or liquidity.[3] UBS had not previously disclosed these more detailed and specific

---

[3] By way of example, as a reflection of the complexity and specificity of the formulas, Margin Levels I specifies that a final margin level adjusted for add-ons may be calculated using the following formula: "Final Margin = Base Margin * (1 + Portf[olio] Concentration Add-on) * (1 + Liquidity Add-on) * (1 + Security Specific Add-on)." Determining the value of those add-ons requires reference to other tables in the document, and likely further calculation. For instance, reference to the "Liquidity Add-On" table for stocks shows that a liquidity add-on will apply if the "[Number of ]Shares > 2 of Av[erage] Trading Volume," with average trading

internal margin guidelines and formulas. Willow Creek met the December 2008 margin call.

In February 2009 UBS informed Willow Creek that WCCP's account again was in a margin call, for roughly $13 million. UBS then sent Willow Creek a revised version of its Prime Broker Margin Levels document ("Margin Levels II"), which reflected what appear to be several changes to UBS's margin rules, including the adoption of new rules regarding margin adjustments and add-ons relating to a portfolio's liquidity and volatility. Prior to the margin call, Willow Creek received no notice that any changes would be made to UBS's margin rules. Instead, an e-mail from UBS accompanying the document indicated that the new liquidity and volatility adjustments had "affected requirements in [the Willow Creek] portfolio in recent weeks and months." The revised margin rules significantly increased the amount of collateral Willow Creek was required to maintain in its account, forcing it to liquidate holdings and abandon some of its hedging strategies to raise capital to satisfy the February 2009 margin call.

Willow Creek claims that meeting the margin call ultimately caused it to lose over $25 million.[4] It later moved its margin accounts from UBS to a different prime broker.

B. Procedural History

Willow Creek sued UBS in April 2010, asserting a claim under Rule 10b-16, as well as state law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, fraudulent concealment, negligent misrepresentation, and unjust enrichment. UBS moved for judgment on the pleadings, arguing that the Initial Disclosure Statement satisfied

volume "computed as [the] moving average of [the] last 30 trading days' volume." The resulting add-on is, in turn, computed as "5% * ([Number of ]Shares - Av[erage] Trading Vol[ume] - 2)."

[4] Willow Creek also alleges that these same margin rules were imposed on the WCSB margin account, resulting in additional margin calls and losses.

7

Rule 10b-16(a)'s disclosure requirements, that Rule 10b-16(b) does not require advance written notice before a broker makes changes to its margin policies, and that there is no private right of action to enforce Rule 10b-16.

The District Court granted UBS's motion on the ground that UBS had provided sufficient notice of its right to require the deposit of additional collateral at its discretion and had disclosed the factors it would consider in doing so. Having dismissed Willow Creek's Rule 10b-16 claim on the merits, the District Court did not address whether the Rule provides a private right of action, and also declined to exercise supplemental jurisdiction over the remaining state law claims. Willow Creek appealed.

Prior to oral argument, to aid our analysis, we solicited the views of the SEC regarding whether a private right of action exists under Rule 10b-16, and whether UBS's more specific margin rules were required to be disclosed pursuant to Rule 10b-16(a). In response, the SEC, as amicus curiae, urges us to hold that (1) Rule 10b-16 may be enforced in private actions, (2) Rule 10b-16(a) requires a broker to disclose its general policies with respect to when more collateral may be required, but does not require that a broker disclose detailed descriptions of complex internal guidelines, and (3) Rule 10b-16(b) does not require a broker to give advance written notice before changing its margin policies.

**DISCUSSION**

Reviewing the District Court's judgment de novo, we "accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiffs' favor." Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010) (quotation marks and alterations omitted). "To survive a Rule 12(c) motion, [a plaintiff's] 'complaint must contain sufficient factual matter, accepted as true, to

8

state a claim to relief that is plausible on its face.'" Johnson v. Rowley, 569 F.3d 40, 44 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks omitted)).

A. Federal Regulation of Margin Accounts

    1. Margin Levels

The Federal Reserve Board and FINRA promulgated federal regulations and rules that required Willow Creek to maintain minimum equity levels of at least twenty-five percent in its margin accounts. See 12 C.F.R. § 220.12(a) (setting initial margin requirements for certain equity securities at "50 percent of the current market value of the security or the percentage set by the regulatory authority where the trade occurs, whichever is greater"); FINRA Rule 4210(c)(1) (requiring maintenance margin of "25 percent of the current market value of all securities, except for security futures contracts, 'long' in the account"). Brokers registered with FINRA may impose additional margin requirements when extending a margin loan to a customer. See FINRA Rule 4210(d) ("Procedures shall be established by members to . . . formulate their own margin requirements[] and . . . review the need for instituting higher margin requirements . . . than are required by this [provision] . . . ."). If the value of the securities and other acceptable property held in a margin account falls below the required margin level, a broker may issue a "margin call" notifying the account owner that it will need to either post additional collateral or sell some of its securities in the account to satisfy the collateral requirements.

    2. Rule 10b-16

The SEC promulgated Rule 10b-16 pursuant to its authority under Section 10(b) of the Exchange Act in order to require, in connection with margin accounts, truth-in-lending disclosures "substantially similar" to those required by the Truth in Lending Act ("TILA") for

forms of consumer credit. See Adoption of Rule 10b-16, Exchange Act Release No. 34-8773, 34 Fed. Reg. 19,717 (Dec. 16, 1969) (hereinafter "Release No. 34-8773"). The Rule governs what a broker must disclose regarding its margin policies and requires brokers who extend credit in connection with a securities transaction to tell their clients about key terms applicable to their margin accounts and to notify them in writing before revising the credit terms. Specifically, as relevant here, subsection (a) of the Rule requires brokers to provide the following "at the time" a client opens an account:

> a written statement or statements disclosing . . . (vii) the nature of any interest or lien retained by the broker or dealer in the security or other property held as collateral and the conditions under which additional collateral can be required[.]

17 C.F.R. § 240.10b-16(a)(1). Subsection (b) of the Rule addresses the notice required before changes can be made to credit terms after an account is opened. It provides:

> [i]t shall be unlawful for any broker or dealer to make any changes in the terms and conditions under which credit charges will be made (as described in the initial statement made under paragraph (a) of this section), unless the customer shall have been given not less than thirty (30) days written notice of such changes . . . .

17 C.F.R. § 240.10b-16(b).

When Rule 10b-16 was promulgated, the SEC explained that "[t]he initial disclosure is designed to insure that the investor . . . understands the terms and conditions under which credit charges will be made," and that "[t]his will enable him to compare the various credit terms available to him and to understand the methods used in computing the actual credit charges." Release No. 34-8773, 34 Fed. Reg. at 19,717.

B. Rule 10b-16(a)

   1. Standing

As an initial matter, UBS argues that Willow Creek lacks Article III standing to pursue a claim under Rule 10b-16(a) because it alleges injuries that were not caused by UBS's alleged violation of the law – that is, by UBS's failure to comply with its initial disclosure obligations when Willow Creek opened its accounts. We disagree.

As relevant here, to have Article III standing Willow Creek "must have suffered an injury in fact" that is "concrete and particularized," "actual or imminent," and "fairly traceable to the challenged action." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (quotation marks and alterations omitted). "Injury in fact is a low threshold . . . ." Ross v. Bank of Am., N.A., 524 F.3d 217, 222 (2d Cir. 2008). When we assess a lack-of-standing argument on the basis of the pleadings, moreover, we take as true the factual allegations contained in the complaint. Ctr. for Reprod. Law & Policy v. Bush, 304 F.3d 183, 191-92 (2d Cir. 2002).

Here, the complaint alleged that information regarding UBS's specific margin rules was "material to [Willow Creek's] decisions whether to purchase and sell securities in [its] accounts," and that UBS's failure to disclose its specific margin rules to Willow Creek prior to the margin calls prevented it from using those rules "to plan and manage the [Willow Creek] accounts accordingly and effectively." The complaint further alleged that "[h]ad [UBS] disclosed the full, truthful margin terms in a timely fashion, plaintiffs would not have acquired securities on margin from UBS, would not have continued to hold securities they had previously purchased, and would have made other decisions regarding purchasing and selling securities in the [Willow Creek] accounts." Plaintiffs also assert that they were injured "[a]s a direct and proximate result

11

of the foregoing conduct," and that meeting the margin call caused them to lose over $25 million. Taken together, these allegations are plainly enough to permit the inference that Willow Creek suffered a distinct and palpable financial injury fairly traceable to UBS's alleged failure to fully disclose its margin rules when Willow Creek opened its margin accounts. We conclude that, having indisputably satisfied the other Article III standing requirements, see Lujan, 504 U.S. at 560-61, Willow Creek has standing to pursue its claim against UBS under Rule 10b-16(a).

2. Disclosures Required by Rule 10b-16(a)

UBS urges that, even if Willow Creek has standing, its disclosures in the Client Account Agreements and the Initial Disclosure Statement satisfied the requirements of Rule 10b-16(a). We agree, mindful that on the merits of Willow Creek's claim, the issue before us is narrow: having adopted and invoked more specific margin rules applicable to Willow Creek to make the margin call, did UBS nevertheless satisfy the requirements of Rule 10b-16(a) by making more general initial disclosures?

In determining what disclosures UBS was required to make, we look first to the language of Rule 10b-16, recognizing that the Rule was promulgated under Section 10(b), a provision designed to deal with manipulation and deception. See Chiarella v. United States, 445 U.S. 222, 234-35 (1980) ("Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud."); cf. SEC v. Dorozhko, 574 F.3d 42, 50-51 (2d Cir. 2009) (computer hacker's actions must be "deceptive" to fall within scope of Section 10(b)). The relevant part of the Rule requires brokers to provide written disclosure of "the conditions under which additional collateral can be required." 17 C.F.R. § 240.10b-16(a)(1)(vii) (emphasis added). By contrast, the Rule elsewhere refers explicitly to the "specific conditions" under which rates of interest can be changed, see 17

C.F.R. § 240.10b-16(a)(1)(iv) (emphasis added), or requires a broker to disclose a method or specific numerical rule for calculating credit charges in connection with a margin account. For example, other subprovisions of Rule 10b-16(a) variously require disclosure of "the method of computing interest," "the method of determining the debit balance or balances on which interest is to be charged," and annual interest rates. 17 C.F.R. § 240.10b-16(a)(1) (ii), (iii) & (v).

Of course, the term "conditions" is neither self-defining nor defined in the Exchange Act or Rule 10b-16. The relevant language of the Rule is, therefore, arguably ambiguous. Keeping in mind both the anti-fraud objectives of Rule 10b-16 and the fact that the Rule does not by its terms require the disclosure of "specific" conditions relating to the posting of additional collateral, however, we conclude that the Initial Disclosure Statement adequately disclosed the terms of the margin loans, including UBS's right to demand more collateral and the factors that it could consider in deciding whether to do so.

Two parts of the Initial Disclosure Statement in particular support our conclusion. To start, the Statement identified the factors UBS deemed relevant and also explicitly warned that UBS had the right to demand more collateral or change its margin requirements at any time. By listing the factors it would consider, UBS adequately informed Willow Creek of the range of future circumstances that might trigger a margin call. Indeed, the adjustments for liquidity, concentration, and volatility that are contained in Margin Levels I and Margin Levels II – and that Willow Creek claims were undisclosed and resulted in the detrimental upward adjustment of the collateral requirements for its accounts – are disclosed in the Initial Disclosure Statement by reference to the "marketability of the securities," "concentration of particular securities in the account," and "market conditions generally at the time."

13

Critically, in our view, UBS also disclosed the existence of "more specific information with respect to [UBS] general margin policies," which Willow Creek could request. Willow Creek, admittedly a sophisticated investor, failed to follow up on UBS's clear invitation to obtain that information. Oral Arg. Tr. at 3. Given the disclosures, warnings, and invitation to follow up that are contained in the Initial Disclosure Statement, we are hard put to conclude that Willow Creek has alleged deceptive conduct of the sort necessary to violate Rule 10b-16.[6] See In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig., 586 F. Supp. 2d 172, 194-95 (S.D.N.Y. 2008) (Lynch, J.) (pointing to deception as the touchstone of a violation under Rule 10b-16). In short, we see no material disparity between UBS's actual margin policies and the general margin policies that it disclosed to Willow Creek.

The SEC's views in this case reinforce our decision. In its amicus brief, the SEC makes a persuasive argument in support of UBS's interpretation of the Rule. First, it explains that Rule 10b-16 is purely a disclosure rule that does not require brokers to adopt particular margin policies; it requires only that firms that do adopt such policies provide useful guidance to investors. Second, the SEC maintains that more detailed disclosures regarding margin requirements may not be useful to investors because brokerage firms may change their margin policies without notice, thereby increasing the risk that investors will rely on outdated standards. As the SEC puts it, investors are better served by the disclosure of relevant factors with an explicit warning that the brokerage firm can impose different requirements at any time.

---

[6] Notably, this is not a case in which a broker is alleged to have relied on undisclosed factors when making the decision to demand additional collateral.

"[A] reasonable agency determination, when advanced in an amicus brief that is not a post hoc rationalization, may be entitled to some deference on account of the specialized experience and information available to the agency." Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ., 464 F.3d 229, 239 (2d Cir. 2006) (quotation marks, alteration, and citation omitted). Here, the SEC's position accords with our view that, given the purpose of the Rule, the Initial Disclosure Statement gave Willow Creek enough information about the circumstances and factors that may trigger a margin call. It accurately informed Willow Creek about the essential terms of UBS's margin loans and about the existence of more specific information that Willow Creek could request. More disclosure may be better, but this was enough.

Our conclusion is further supported by the legislative history of Rule 10b-16. The SEC promulgated the Rule in response to Congress's suggestion, when it passed TILA, that the SEC devise rules that would "require substantially similar disclosure" to that provided for consumer credit. S. Rep. No. 90-392, at 9 (June 29, 1967). Concerned that consumers were misled regarding credit terms or relevant fees and interest rates, Congress sought through TILA to ensure that consumers could make informed decisions when obtaining credit and avoid unfair billing and charging practices. See 15 U.S.C. § 1601; S. Rep. No. 90-392, at 3. Requiring brokers to disclose their general policies regarding the circumstances that may trigger a margin call both promotes the salutary goal of helping investors make an informed decision when choosing among brokers and serves to avoid fraud relating to margin accounts. See Note, SEC Rule 10b-16 and the Regulation of Margin Credit, 87 Yale L.J. 372, 379 n.31 (1977) (noting that the Rule was intended "to operate as a consumer protection measure regulating disclosure of the

15

costs of margin credit"). "[I]t must be remembered that Rule 10b-16, like the Truth in Lending Act, is a rule of disclosure for the benefit of the customers; it is not a rule for the financial safety of the brokerage firms." Liang v. Dean Witter & Co., 540 F.2d 1107, 1112-13 (D.C. Cir. 1976).

Liang v. Dean Witter & Co., the only other circuit court decision on this issue, is generally in accord. There a brokerage firm had disclosed only that it might, at its discretion, require the account-holder to deposit cash or additional collateral. Id. at 1109. The D.C. Circuit concluded that "[t]o the extent . . . broker-dealers have adopted and invoke a general policy with respect to additional collateral, either in all cases or in a substantial number of cases such that invocation of that policy in a particular case is significantly probable," the broker-dealer must disclose its "actual policy." Id. at 1112. The court held that it could be misleading for a broker to suggest that it would consider the need for additional collateral based on the individual circumstances of the customer, when in fact the broker had a general policy that ignored those individual circumstances, even if it exercised some discretion in the application of that policy. Id. We see nothing similarly misleading here, as the margin policies reflected in the Initial Disclosure Statement appear in every material respect to be UBS's actual policies.

In urging a contrary conclusion, Willow Creek makes two principal arguments. First, it claims that Liang supports its position. The facts of that case, however, are easily distinguishable. Unlike UBS, the broker in Liang, Dean Witter, disclosed only that it maintained sole discretion to determine the need for additional collateral; it failed to disclose any factors that might prompt it to reevaluate the sufficiency of the existing collateral. Id. at 1109. Second, Willow Creek asserts that permitting brokers to disclose general factors, rather than the more specific formulas they may consider in making a margin call, undermines the purpose of Rule

16

10b-16. For reasons we have already given, we disagree. Rule 10b-16(a)'s initial disclosure requirements serve (1) to ensure that the new investor understands the terms and conditions under which credit decisions will be made, and (2) to protect investors from deception under Section 10(b). See 15 U.S.C. § 78j(b). Because the Initial Disclosure Statement listed the general terms and conditions and also invited the investor to get more specific information about those terms, Willow Creek cannot plausibly claim that it was deceived.

As alternative arguments, Willow Creek contends that UBS violated Rule 10b-16(a) because it failed to establish adequate procedures to ensure that its customers would receive the required disclosures, and it exercised its discretion in an arbitrary and capricious manner when it made the margin calls. We reject these arguments. First, Willow Creek has not alleged any injury from UBS's failure to establish disclosure procedures. Indeed, Willow Creek acknowledged that it received all of the relevant disclosure documents. Second, Willow Creek's allegations that UBS exercised its discretion in raising its margin requirements in an arbitrary and capricious manner fall outside the scope of conduct prohibited by Rule 10b-16. If anything, those allegations relate to Willow Creek's state-law claim for breach of the implied covenant of good faith and fair dealing. See Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995) ("Where the contract contemplates the exercise of discretion, [the implied obligation to exercise good faith] includes a promise not to act arbitrarily or irrationally in exercising that discretion."). The District Court properly dismissed that claim for lack of jurisdiction after it granted judgment on the pleadings as to all of Willow Creek's federal claims.

C. Rule 10b-16(b)

Willow Creek also claims that UBS's failure to provide it with advance notice of the changes to its margin policies violated Rule 10b-16(b), which requires brokers to provide at least thirty days written notice to customers in advance of "any changes in the terms and conditions under which credit charges will be made." 17 C.F.R. § 240.10b-16(b). It argues that UBS's margin rules were relevant conditions relating to credit charges, and that UBS failed to provide the requisite written notice of the revisions to its margin rules. Again, we disagree.

Margin policies and credit charges are two separate concepts. In general, a broker's margin policies govern the amount of collateral an investor must provide, not the amount or timing of fees or the methods of calculating interest on the loan. Rule 10b-16(a) describes a number of terms and conditions – separate and apart from the required information regarding margin policies – that relate directly to what a broker can charge a customer in exchange for providing a margin loan. See 17 C.F.R. § 240.10b-16(a). These include "the annual rate or rates of interest," "the method of computing interest," "the method of determining the debit balance . . . on which interest is to be charged," and "other charges resulting from the extension of credit." Id. Because margin maintenance requirements are not plainly "credit charges" as that term is commonly understood, the Rule does not appear to require advance written notice when a broker changes those requirements.

The SEC addressed this issue in 2001, when the NASD proposed a rule that would require NASD member firms to provide a margin disclosure statement to non-institutional customers when they opened margin accounts. The NASD's proposed rule would have required member firms to make the following disclosure:

18

> The firm can increase its "house" maintenance margin requirements at any time and is not required to provide you advance written notice. These changes in firm policy often take effect immediately and may result in the issuance of a maintenance margin call.

Order Approving Proposed Rule Change by the NASD Relating to the Delivery Requirement of a Margin Disclosure Statement to Non-Institutional Customers, Exchange Act Release No. 34-44223, 66 Fed. Reg. 22,274, 22,275 (Apr. 26, 2001). In approving the NASD's proposed rule as consistent with the Exchange Act and Rule 10b-16, the SEC provided the following explanation:

> Some investors believe that an NASD member firm must provide thirty days written notice before implementing this type of [margin requirement] change. While Rule 10b-16 under the Act requires members to disclose to customers the credit terms (interest rates and methods of calculating interest) for margin transactions and requires advance written notice of such changes, it does not require advance notice of the amount of margin required.

Id. at 22,277. The SEC reaffirmed its position in 2009, when it approved the reissuance of the NASD rule regarding margin disclosure statements as a FINRA rule. See Order Granting Approval of Proposed Rule Change to Adopt FINRA Rule 2264 (Margin Disclosure Statement), Exchange Act Release No. 34-60697, 74 Fed. Reg. 49,051-01 (Sept. 21, 2009). In its amicus brief in this case, the SEC adheres to its position that "Rule 10b-16(b) does not apply to changes in collateral requirements because those requirements are not 'credit charges.'" The SEC's long-held interpretation is reasonable, consistent with the language of Rule 10b-16(b), and accords

with the policies behind the Rule that we have already discussed.[7] See Talk Am., Inc. v. Mich. Bell Tel. Co., 131 S. Ct. 2254, 2261 (2011).

D. Leave to Amend or to Conduct Discovery

Finally, Willow Creek asserts that the District Court erred because it failed to grant it leave to amend its complaint. "It is within the sound discretion of the district court to grant or deny leave to amend." Wilson v. Merrill Lynch & Co., 671 F.3d 120, 139 (2d Cir. 2011) (quotation marks and alteration omitted). Here, Willow Creek conclusorily requested leave to amend in two sentences in its opposition to UBS's motion for judgment on the pleadings, without specifying what additional factual allegations it would include if leave were granted, or how an amended complaint would cure the deficiencies the District Court identified in its original complaint. Accordingly, the District Court acted within its discretion in denying the request for leave to amend. See Metz v. U.S. Life Ins. Co., 662 F.3d 600, 603 (2d Cir. 2011). In any event, given our determination that UBS's disclosures satisfied the requirements of Rule 10b-16 as a matter of law, any attempt to amend the complaint would have been futile. See Sudler v. City of New York, 689 F.3d 159, 179 (2d Cir. 2012).

---

[7]On appeal, UBS argues that we should affirm the dismissal of Willow Creek's claims on the ground that there is no private right of action to enforce Rule 10b-16. Whether such a private right of action exists is an open issue in this Circuit. Although other circuits, and district courts within this Circuit, have recognized such an implied private right of action, none have addressed the issue since Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 164-65 (2008), which curtailed the recognition of private rights of action under Section 10(b). We need not address the issue, however, because, even assuming that such a right exists, we conclude that the District Court properly dismissed Willow Creek's claims on the merits for failure to state a claim.

In a similar vein, Willow Creek argues that the District Court should have permitted discovery as to whether UBS invoked its generally applicable margin rules or simply exercised its discretion when it reevaluated the collateral requirements for Willow Creek's margin accounts. There is no need for us to remand for discovery; UBS's disclosures were sufficient even assuming that, as alleged, UBS invoked the rules set out in Margin Levels I and Margin Levels II.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the District Court.