17-1199-cv
Harry v. Total Gas & Power North America, Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2017

(Argued: November 15, 2017    Decided:  May 4, 2018)

Docket No. 17-1199-cv

_____

ALAN HARRY, LEVANTE CAPITAL, LLC, PUBLIC UTILITY DISTRICT NO. 1
OF CLARK COUNTY, WASHINGTON, DBA CLARK PUBLIC UTILITIES, C&C
TRADING, LLC,

*Plaintiffs-Appellants*,

v.

TOTAL GAS & POWER NORTH AMERICA, INC., TOTAL S.A., TOTAL GAS &
POWER LIMITED,

*Defendants-Appellees*. [1]

_____

Before: POOLER, WESLEY, and HALL, *Circuit Judges*.

---

[1] The Clerk of Court is directed to amend the caption as above.

Drawing on CFTC and FERC findings, investors who trade natural gas derivatives on the New York Mercantile Exchange and Intercontinental Exchange sued for damages resulting from Defendants' manipulation of natural gas trading at four regional hubs in the western part of the United States. However, the derivatives that Plaintiffs traded were not indexed to the natural gas at those regional hubs. Instead, they derived their prices from natural gas trading at Henry Hub, a regional hub in Louisiana that dwarfs all other regional markets. The district court (John G. Koeltl, *J.*) dismissed Plaintiffs' suit on the grounds that they did not successfully plead injury, and thus failed to establish standing or to state a claim under the Commodities Exchange Act or antitrust laws. We find, to the contrary, that the Plaintiffs successfully pleaded standing. Having satisfied ourselves of our jurisdiction, we agree with the district court that Plaintiffs failed to plausibly allege injury under any of their claims. The order and judgment of the district court are modified to remove the dismissal for lack of standing. As modified, we AFFIRM the district court's judgment.

Affirmed.

———————————

DAVID E. KOVEL, Kirby McInerney LLP (Michael Eisenkraft, Times Wang, Cohen Millstein Sellers & Toll, PLLC, Kellie C. Lerner, Bernard Persky, Robins Kaplan LLP, *on the brief*), New York, NY, *for Plaintiffs-Appellants.*

DAVID DEBOLD, Gibson, Dunn & Crutcher LLP (William S. Scherman, Jason J. Fleischer, *on the brief*), Washington, DC, *for Defendants-Appellees.*

POOLER, *Circuit Judge*:

This case provides us an occasion to clarify pleading standards under the Commodities Exchange Act ("CEA") and to differentiate those standards from the standard for pleading constitutional standing.

Drawing on Commodities Future Trading Commission ("CFTC") and Federal Energy Regulatory Commission ("FERC") findings, several investors[2] who trade commodities derivatives on the New York Mercantile Exchange and Intercontinental Exchange sued for damages resulting from Defendants' manipulation of natural gas trading at four regional hubs in the western part of the United States. However, the derivatives that Plaintiffs traded were not

---

[2] Plaintiffs are both individual and institutional investors: Alan Harry, Levante Capital, LLC, Public Utility District No. 1 of Clark County, Washington, DBA Clark Public Utilities, and C&C Trading, LLC.

indexed to the natural gas traded at those regional hubs. Instead, the contracts they have traded derive their prices from natural gas trading at Henry Hub, a regional hub in Louisiana that dwarfs all other regional markets. The district court (John G. Koeltl, *J.*) dismissed Plaintiffs' suit on the grounds that they did not plead injury, and were thus unable to establish standing or to successfully state a claim under either the CEA or antitrust laws. We agree that Plaintiffs failed to do more than establish that their injury was conceivable. While we disagree that this fact dooms their ability to establish Article III standing, we agree that it is fatal to their ability to plead substantive causes of action. Accordingly, the judgment and order of the district court are modified to remove the dismissal for lack of standing. As modified, we affirm the district court's judgment.

## BACKGROUND

### I.  Factual Background

Natural gas flows from extractors to refiners through a network of pipes. Once refined, it travels through to regional hubs of varying sizes, whence it makes its way to wholesalers, distributors, and, ultimately, end users. When a

wholesaler or speculator buys the right to a certain amount of natural gas, they buy it from a particular regional hub. Although trading of natural gas takes place at these hubs all day every day via "spot trades," the trading that takes place during "bidweek"—i.e. the last five business days of a month—is the most important. During bidweek, producers sell and purchasers buy most of the natural gas they will use in the coming month. These traders then report the details of these transactions to the trade publications of *Platts* and *Natural Gas Intelligence*, which calculate monthly price indices based on the weighted average of each hub's prices. These indices are then used as the reference point in pricing spot trades of natural gas over the course of the following month.

The major hub in the United States is "Henry Hub" in Erath, Louisiana. Henry Hub is considered the central national hub, both because the volume of natural gas that travels through it dwarfs all others and because much of the natural gas at other hubs in the country travels to, from, or through it. Its monthly index price is calculated slightly differently than at other hubs. Rather than averaging trades throughout all of bidweek, it averages only those that take place during the last thirty minutes of the middle day of bidweek.

Natural gas derivative contracts are valued on the basis of the price of natural gas bought from a particular hub at a particular time. For example, a natural gas *future* allows a purchaser to buy the right to be paid the value of the natural gas trading at a particular hub at a particular date. A natural gas *swap* allows traders to exchange the price of natural gas contracts at two different hubs, at two different times, or at two different hubs at two different times. The price of gas at Henry Hub serves as the basis for natural gas futures and options contracts traded on the major national exchanges where natural gas is traded: the New York Mercantile Exchange ("NYMEX") and the Intercontinental Exchange ("ICE"). Derivatives based on smaller regional hubs are traded over the counter, not on these exchanges.

Although there is some overlap, natural gas *commodity* trading is mostly regulated by FERC and natural gas *derivative* trading is mostly regulated by the CFTC. In June 2012 Matt Wilson contacted both the FERC and the CFTC to report market manipulation in four commodities markets and the derivatives based on those markets. Wilson was a trader at the West Desk of Total Gas & Power North America, Inc. ("Total Gas"). Total Gas, a Delaware corporation, is wholly owned by Total S.A., a French corporation. Total S.A. is the world's fourth-largest oil

6

and gas company. It also owns a British affiliate, Total Gas & Power Limited. All of these companies are defendants in this action, but only the actions of the U.S. entity are at issue.

After FERC and the CFTC investigated Wilson's allegations, both agencies concluded that the West Desk at Total Gas had engaged in a multi-year strategy to repeatedly manipulate the price of natural gas commodities at regional hubs in the western United States. West Desk did so in order to benefit Total Gas's trading of derivatives based on the gas at those hubs. In other words, FERC and the CFTC found that Total Gas placed big bets that certain parts of the natural gas market would look a certain way and then, through a coordinated and concealed effort to overwhelm other traders in that part of the market, ensured that it would look that way. The CFTC settled with Total Gas for $3.6 million. FERC's enforcement action, seeking over $213 million, is ongoing.

The alleged scheme was oriented towards the maximization of the profit that Total Gas could make from two types of derivatives: basis swaps and index swaps. A basis swap is a bet that the absolute value of the difference between the monthly index price of a regional hub's natural gas and the monthly index price of Henry Hub's natural gas would go up or down. In an index swap, one party

7

pays the monthly index price of natural gas at a given hub—i.e. that which has been determined by averaging the trades during the bidweek that took place *before* that month—in exchange for the average price of the natural gas at that same hub during that month. Being able to control a monthly index price gives a trader an obvious advantage in making money on both of these derivatives. Traders at West Desk realized that they could do so by "banging the index" at some regional hubs, which necessitated dominating trading during bidweek through the following scheme.

Trading in the El Paso Permian Basin ("Permian"), El Paso San Juan Basin ("San Juan"), Southern California Gas Co. ("SoCal"), or West Texas Waha ("Waha") regional hub, the West Desk would purchase large amounts of the swaps it wanted to profit on and then obtain a controlling position—generally over 80% of the market—of the natural gas at that hub. When bidweek arrived, West Desk would be able to leverage its overwhelming market power in the targeted hub to make the price of gas go up or down. Sometimes these trades would result in losses (these are referred to as "uneconomic trades"). But even losses in trading of the primary commodity did not matter to Total Gas, because they were swamped by the gains they enabled in derivatives based on the

8

commodity. Total Gas could gain such a controlling share at regional hubs in part because they are traded much more thinly than Henry Hub. One has to buy less gas to own a large portion of it. West Desk traders would keep their peripheral vision on the price at Henry Hub to determine how high or low to push the regional hub they were focused on (since pricing of basis swaps depends on the relationship between the two), but it is not alleged that they took any action to directly manipulate trading at Henry Hub. At the end of bidweek, they would report their trades accurately to *Platts* and *Natural Gas Intelligence*.

Plaintiffs apparently learned about Total Gas's schemes along with the rest of the public when the CFTC released its findings. They are various individuals and entities that traded natural gas derivatives on NYMEX and ICE between June 2009 and June 2012—the period of manipulation. None of them claims to have traded any natural gas or natural gas derivatives at the hubs at which Defendants traded. Instead, they argue that the shockwaves from Defendants' market manipulation at those hubs reverberated through to trading at Henry Hub, which harmed them as they traded derivatives based on Henry Hub price indices.

## II.     Proceedings Below

Plaintiffs brought suit against Defendants alleging violations of the CEA and antitrust laws. Their complaint largely reiterates the findings of the CFTC and FERC investigations. They claimed that the markets in natural gas in the United States should be viewed as an integrated whole, such that manipulation anywhere harms traders of natural gas everywhere. In support of this proposition, they pointed to two academic studies finding price cointegration between regional hubs and to their own expert's analysis of the relevant prices.

Defendants moved to dismiss for lack of standing and failure to state a claim. The district court granted the motion. The court below found that Plaintiffs failed to plead facts giving rise to a plausible inference that Defendants' manipulations had any effect on Henry Hub prices. As such, it found that Plaintiffs failed to establish either harm or intent and therefore failed to establish standing or a cause of action under the CEA or the Sherman and Clayton Acts. *Harry v. Total Gas & Power North America, Inc.*, 244 F. Supp. 3d 402 (S.D.N.Y. 2017). Plaintiffs timely appealed.

**DISCUSSION**

Without doubt, Plaintiffs' complaint provides ample grounds to infer that Defendants engaged in repeated market manipulation. It has the benefit of FERC's and the CFTC's investigations, after all. But unlike those agencies, Plaintiffs do not have the right to bring suit against any person they reasonably suspect has committed a certain sort of wrong. There are no citizens' arrests for commodities fraud, and, in any case, the sheriffs in that particular town are already on the case. Plaintiffs can only recover in a civil action if they can establish that they themselves have been harmed by Defendants' activities.

This limit on suits manifests in two distinct legal inquiries. Article III of the Constitution limits the federal judiciary's power to hear "cases or controversies," and there is no case or controversy where a plaintiff fails to allege injury. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-48 (2016). Additionally, both of the substantive causes of action that Plaintiffs allege require them to plead enough facts to make it plausible that they did indeed suffer the sort of injury that would entitle them to relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

It is well established in principle that the pleading standard for constitutional standing is lower than the standard for a substantive cause of

11

action. *See Ross v. Bank of America, N.A.*, 524 F.3d 217, 222 (2d Cir. 2008). This case illustrates the practical difference reflected by that distinction. Plaintiffs have pled enough facts to make their claim of injury colorable but not enough to make it plausible. Thus, although they have constitutional standing to bring their claims, we agree with the district court that their complaint must be dismissed because those claims lack merit.

## I.      Article III Standing

Though it evaluated Plaintiffs' substantive claims at length, the district court also concluded that it did not have subject matter jurisdiction over those claims due to Plaintiffs' lack of standing to raise them. *Harry*, 244 F. Supp. 3d at 415 n.5, 420 n.13. For the reasons that follow, we disagree.

To establish standing under Article III of the Constitution, a plaintiff must allege "(1) *injury-in-fact*, which is a concrete and particularized harm to a legally protected interest; (2) *causation* in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied

12

by the requested relief." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106–07 (2d Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)) (internal quotation marks omitted). Only injury-in-fact, "the first and foremost of standing's three elements," *Spokeo*, 136 S. Ct. at 1547 (internal punctuation omitted), is at issue here, since the only injury Plaintiffs attempt to plead is that which Defendants have caused.

To successfully plead injury-in-fact, a plaintiff must only "clearly…allege facts demonstrating," *Warth v. Seldin*, 422 U.S. 490, 518 (2d Cir. 1975) (quoted in *Spokeo*, 136 S. Ct. at 1547), that she had a "a legally protected interest in a manner that is concrete and particularized" and that a defendant "inva[ded]" that interest. *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014) (quoting *Lujan*, 504 U.S. at 560). "Clearly alleging" is a "low[er] threshold" than that for "sustaining a valid cause of action." *Ross*, 524 F.3d at 222 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)); *see also WC Capital Management, LLC v. UBS Securities, LLC*, 711 F.3d 322, 329 (2d Cir. 2013). While the pleading of a cause of action must "possess enough heft to show that the pleader is *entitled to relief*," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks and brackets removed) (emphasis added), to plead standing, the pleader need only

show that allowing her to *raise* her claim in federal court would not move so beyond the court's ken as to usurp the power of the political branches. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Unless an allegation of injury is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy," *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998) (quoting *Oneida Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974)), the mere fact that it "raises a federal question…confers power [on a federal court] to decide that it has no merit, as well as to decide that it has." *Montana-Dakota Utilies Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 249 (1951).

Plaintiffs argue that they have standing because prices at U.S. natural gas hubs are so interconnected that manipulation at any of the hubs amounts to manipulation of all of them, including the one on which the prices of their derivative contracts were based. We do not think the pleadings make that interconnection plausible, but they do place it within the realm of possibility. For standing purposes, that is enough.

## II. Substantive Causes of Action

### A. Commodities Exchange Act Claims

Private plaintiffs that meet the requirements of Section 22 of the CEA may sue for violations of that statute. *See* 7 U.S.C. § 25; *Klein & Co. Futures, Inc. v. Board of trade of City of New York*, 464 F.3d 255, 259–60 (2d Cir. 2006). These requirements used to be referred to as "statutory standing," but, to avoid incorrectly portraying them as jurisdictional requirements, they are now referred to as "simply a question of whether the particular plaintiff has a cause of action under the statute." *American Psychiatric Association v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2013) (internal quotation marks omitted)). Subsection (a)(1) of Section 22 states that "[a]ny person…who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for *actual damages* resulting" from one of four types of violations, including, as relevant here, market manipulation. 7 U.S.C. § 25(a)(1) (emphasis added). Although we have not had occasion to rule on the matter, district courts in this Circuit have consistently held that the fact that Section 22 limits a defendant's liability to

"actual damages" compels a plaintiff to plead "actual injury caused by the violation" in addition to the elements of whatever violation they allege in order to successfully state a claim. *See*, *e.g.*, *In re London Silver Fixing, Ltd., Antitrust Litigation*, 213 F. Supp. 3d 530, 564 (S.D.N.Y. 2016); *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013) ("*Libor I*"); *In re Crude Oil Commodity Futures Litigation*, 913 F. Supp. 2d 41, 60-61 (S.D.N.Y. 2012); *see also Wigod v. Chicago Mercantile Exchange*, 981 F.2d 1510, 1521-1522 (7th Cir. 1992). We see no reason to disturb this well-settled and entirely sensible reading of the statute, nor do Plaintiffs offer any.

The "actual injury" analysis looks very similar to the "injury in fact" analysis used to determine constitutional standing. *See In re Commodity Exchange, Inc.*, 213 F. Supp. 3d 631, 650 (S.D.N.Y. 2016) (analyzing constitutional standing with similar factors); *Foreign Exchange Benchmark Rates Antitrust Litigation*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015) ("*ForEx I*") (same). However, because it is an element of a substantive cause of action, the pleading requirements differ. Injury must be plausible, not just colorable.

For one trader to have injured another, the former must have taken an action that had an impact on the latter's position and that impact must have been

16

negative. One trader cannot ride the wave of another trader's scheme and then drag the manipulator to court for having caused her good fortune. *See Libor I*, 962 F. Supp. 2d at 621 n.18. Thus, if a plaintiff is to successfully plead that a defendant's market manipulations have injured her under the CEA, she must plausibly allege (1) that she transacted in at least one commodity contract at a price that was lower or higher than it otherwise would have been absent the defendant's manipulations, and (2) that the manipulated prices were to the plaintiff's detriment. *See* 7 U.S.C. § 25(a)(1)(D).

The most direct way to plead such harm is to point to a specific manipulated transaction or set of transactions between a plaintiff and a defendant with the plaintiff on the (net) losing end and the defendant on the (net) winning end. In such direct transactions, the effect of a defendant's alleged actions and its detriment to a plaintiff are inextricably tied together. Injury in contract exchanges is inherently plausible when it is alleged to have channeled through privity.

In an age of often anonymous trading platforms it is rare that a plaintiff will be able to allege that she traded directly with a defendant, at least not without discovery. More commonly, she will have to plead enough facts to make

17

plausible the inference that the prices of her trades with a third party have been substantially influenced by a defendant's trades with a third (or fourth or fifth…) party.

In some contexts, the alleged facts can be quite general statements about the nature of the instruments they are trading and the institutional contexts in which those trades take place. By way of example, should a plaintiff plead that she traded and lost money (or failed to gain as much money as she otherwise would have) during a bout[3] of defendant's alleged market manipulation in the same contract type in the same exchange for delivery at same time and place, her pleading of injury is likely to be nearly as good as if she had pled privity. Lesser overlaps might also suffice. A plaintiff who trades in the same commodity or derivative as a defendant, especially for delivery at the same time and place is more likely to feel the impact of significant price shifts caused by the defendant's trading, even if they do not trade on the same exchange. Conversely, a plaintiff trading on the same organized exchange or over-the-counter market during the

---

[3] A plaintiff and defendant need not have been trading *simultaneously* so long as a plaintiff pleads facts indicating that the defendant's actions caused price artificiality during the time in which plaintiff was trading. *See*, *e.g.*, *Commodity Exchange*, 213 F. Supp. 3d at 667.

18

same period of time as the defendant might see an effect on her position even if the defendant trades in a different (but related) contract type. We do not have occasion here to explore the implications of various potential overlaps in any detail. Suffice it to say that the more overlap, the more plausible a defendant's effect on a plaintiff will be. We note as well that, unlike in the case of privity, such connections will not inherently be to a plaintiff's detriment. She will have to plead additional facts to make it plausible that the impact on her was harmful rather than neutral or beneficial.

Alternatively, a plaintiff could allege that she traded (at a detriment) in a contract the price of which was tied, via explicit agreement or other mutual understanding, to the price of a contract that a defendant was plausibly manipulating. Commodity and derivative contracts that index their price formulae to prices of other contracts are linked in a rule-based manner, and several cases in this circuit have found such a link to create a sufficient connection for CEA pleading purposes. *Cf.*, *e.g.*, *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 765-66 (2d Cir. 2016) (showing that certain commodities prices incorporated LIBOR rates); *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 2016 WL 5108131 at *9 (S.D.N.Y. 2016) (same with foreign exchange

rates); *Commodity Exchange*, 213 F. Supp. 3d at 644-46 (discussing this possibility with gold prices). It might also be possible to plead that derivatives are tied in this way to their underlying commodities. A trader in onion futures for delivery on a specific date, for example, might feel the impact of speculators seeking to corner the spot market in onions during that time period. Whether and in which circumstances a derivative's link to an underlying commodity will suffice to make injury plausible on this theory is left for future decision.

However, Plaintiffs do not allege that they suffered injury from direct contractual relationships with Total Gas, manipulated third-party contracts, or direct reliance on a manipulated financial rate. Instead, they allege that Total Gas's manipulation of fixed-price trades at local hubs caused artificial prices in natural gas contracts at Henry Hub, which, in turn, distorted prices in the derivatives based on Henry Hub prices in which Plaintiffs traded.

When a plaintiff seeks to make plausible a connection between distinct contract types traded on distinct exchanges without a formal rule-based price linkage she will have to plead with greater detail. After all, in a world of increasingly interconnected markets, it is always possible to claim that the price of one commodity affected another to some degree. A boilerplate pleading

20

stating that boundaries between markets are porous would allow practically any trader to sue for any manipulation they happened to have heard about in any other commodity. Pleading injury would effectively no longer be a requirement, since at least marginal harm could always effectively be assumed.

Accordingly, where the connection between two contracts is not well established or readily discernible from a basic description of them and the exchanges over which they are traded, a plaintiff will have to elaborate some other tangible mechanism whereby a defendant's trading affects hers more than marginally.[4] *Cf. Libor I*, 962 F. Supp. 2d at 622; *Commodity Exchange*, 213 F. Supp. 3d at 667; *see also In re Amaranth Natural Gas Commodities Litigation*, 730 F.3d 170, 173 (2d Cir. 2013) (setting out the standard for market manipulation under the CEA). The level of detail required will depend on the facts of the case—the more different the contracts and the more distant the places the contracts are traded, the more work a plaintiff will need to do to make the connection between a

---

[4] In articulating this standard, we do not impose a loss causation requirement, which would mandate demonstrating losses in specific trades. We have never imported loss causation from the securities context and we do not begin to do so with this case. *See Crude Oil*, 913 F. Supp. 2d at 60.

defendant's manipulation and a plaintiff's actual injury plausible. Of course, at the pleading stage a tie will go to the plaintiff.

In this case, Plaintiffs have failed to provide facts sufficient to allege a plausible connection between their trading and Total Gas's. One strategy they employ is to argue that natural gas trading in the United States takes place in one big integrated market. Even if we were to grant them this conclusion, it would not get them very far. "Market" is an ambiguous term the definition of which depends on the classificatory purpose of the observer. According to some uses of the term, Plaintiffs and Total Gas clearly do not share a market. They do not trade on the same regulated exchange, for example. On other uses of the term, Plaintiffs and Total Gas clearly do share a market. "The U.S. market for natural gas" includes both of them, as would "the global market for natural gas" or, indeed, "the global energy market." Some of versions of the term pick out connections between traders sufficient to plausibly allege injury, but others do not. Saying traders share a "market" thus does not tell us what we need to know.

But suppose we attempt to define "market" as a term of art, using some objective indicium that may be useful in multiple commodities cases: "price cointegration," for example, or "cross-elasticity of prices." *see, e.g., AD/SAT, Div.*

22

*of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999) (applying the latter concept for the purposes of an antitrust "relevant market" analysis). Or, to revisit our earlier discussion, we might say "market" refers to "trading in the same contract type" or "trading on the same exchange." We think nothing is added to the analysis by declaring that one or another of these possibilities delineates the boundaries of a "market." If a particular statistic or institutional fact indicates that a defendant's trading affected a plaintiff's prices, then it matters in itself. Whether we talk about this effect as taking place within the same market or transgressing the boundaries of more than one market does not alter our considerations, and it may potentially confuse them.

Whether Total Gas and Plaintiffs are in the same market or not, Plaintiffs have not pled enough general facts to make the connection between them plausible. It so happens that contract types in the natural gas market (and here we use the term loosely without attaching any legal significance to it) depend on the hub through which the traded gas passes. As do organized exchanges, derivative structuring, and price indexing. Plaintiffs only ever traded derivatives based on Henry Hub; the West Desk only ever traded natural gas from and derivatives based on Permian, San Juan, SoCal, and Waha hubs.

23

Nor are we convinced that Plaintiffs' positions in Henry Hub derivatives were de facto affected by Total Gas's manipulations at western hubs. As the district court pointed out, Defendants "are alleged to have made 1,182 manipulative trades across four regional hubs over a period of three years….By comparison, although the plaintiffs do not specify how many physical fixed price trades were made at the Henry Hub during the Class Period…[their] own submissions…show that there were approximately 36 million NYMEX futures contracts traded during the Class Period." *Harry*, 244 F. Supp.3d at 415. The enormous disparity between the number of contracts Defendants purchased in order to successfully manipulate one or two regional markets and the number of contracts they would have had to purchase to make a dent at mighty Henry Hub render it implausible that trading at the former distorted trading at the latter. Plaintiffs themselves acknowledge that the much smaller trading volumes at regional hubs makes it easier to manipulate them. They have not plausibly asserted that the relatively small number of transactions it takes to manipulate regional hubs would have any but a negligible impact on Henry Hub's pricing, let alone a noticeable impact on the pricing of derivatives based on the price index calculated from a specific thirty-minute window of Henry Hub prices.

24

The studies and expert analysis that Plaintiffs point to do not alter our reasoning. While the studies do find high cointegration of prices across regions, both seem to attribute this relationship to the outsize effect that Henry Hub prices have on every other regional hub in the United States and not vice versa. Indeed, one of the studies cites approvingly a previous study that "conclude[d] that the Henry Hub price largely defines North American natural gas prices." Ex. 1 of Letter from David E. Kovel, Kelly Lerner, Anthony F. Fata, and Michael Eisenkraft to Judge John G. Koeltl at 9, *Harry v. Total Gas & Power*, 244 F. Supp. 3d 402 (S.D.N.Y. 2017) (No. 15-cv-9689). Plaintiffs' expert provides further support for the inference that Total Gas manipulated the regional markets in a way that would have made swaps profitable, but he says nothing about whether that manipulation channeled through to Henry Hub.

Finally, even assuming arguendo that Total Gas's manipulations impacted Plaintiffs, their complaint provides just as much support for the proposition that they were *benefited* by Total Gas's trading as for the proposition that they were *harmed* by it. We do not require that a plaintiff calculate damages at the pleading stage, but we certainly need some reason to believe that any damage has occurred at all. Only speculation could lead us to that belief here.

In sum, it is not plausible on this record that Plaintiffs were injured by the manipulations West Desk perpetrated, and so Plaintiffs fail to state a CEA claim.

**B. Antitrust Claims**

For similar reasons, Plaintiffs fail to establish antitrust standing. In determining antitrust standing, we "assume[] the existence" of an antitrust violation. *Gelboim*, 823 F.3d at 770 (internal quotation marks omitted). We then ask two questions: (1) "have [plaintiffs] suffered antitrust injury?" and (2) "are [plaintiffs] efficient enforcers of the antitrust laws?" *Id.* at 772; *see also Gatt Communications, Inc. v. PMC Associates, L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).

To answer the first question, we determine whether a plaintiff has suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This involves a "three-step process" in which, first the plaintiff must "identify the practice complained of and the reasons such a practice is or might be anticompetitive"; then the court must "identify the actual injury the plaintiff alleges" by "look[ing] to the ways in which the plaintiff claims it is in a worse position as a consequence of

26

defendant's conduct"; and finally, the court must "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *Gatt*, 711 F.3d at 76 (punctuation omitted). "Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury." *In re Aluminum Warehousing Antitrust Litigation*, 833 F.3d 151, 158 (2d Cir. 2016). However, "the Supreme Court carved a narrow exception to the market participant requirement for parties whose injuries are 'inextricably intertwined' with the injuries of market participants." *Id.* (quoting *American Ad Management v. Inc. the General Telephone Co. of California*, 109 F.3d 1051, 1057 n.5 (9th Cir. 1999)); *see also Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982). An injury is "inextricably intertwined" when the defendants "use the plaintiff's injury as the means, fulcrum, conduit, or market force to realize their illegal ends," or when they "corrupt a separate market [in which a plaintiff is a participant] in order to achieve [their] illegal ends." *Id.* at 160-61 (internal quotation marks omitted). The overall inquiry is akin to proximate cause in tort law—plaintiffs may not be "too remote" so as to avoid "duplicative recovery" and "limitlessly increase the universe of potential plaintiffs." *Id.* at 159, 162.

27

Plaintiffs argue that they adequately alleged that they were part of the same undifferentiated natural gas commodities and commodities derivatives market as Defendants, that they were harmed by artificial prices at Henry Hub and on NYMEX, and that Defendants' manipulations required a connection between regional hubs, and as such trading at Henry Hub was inextricably intertwined with their trading.

Set aside whether they were part of the same market as Defendants (they were not) or whether they have shown that Plaintiffs' alleged injuries were the fulcrum for Defendants' scheme (they were not); Plaintiffs do not even present evidence that they traded at "artificial prices." There is no actual injury the Plaintiffs allege, let alone a connection between Defendants' unlawful conduct and that non-injury. Any further analysis of the connection between regional hubs and Henry Hub or comparisons with other case law on antitrust standing is superfluous. Similarly, there is no reason to examine whether Plaintiffs are efficient enforcers; they cannot be. *See Gelboim*, 823 F.3d at 777-78.

## CONCLUSION

We AFFIRM the district court's dismissal of Plaintiffs' claims as modified by the foregoing.