19-2979(L)
*Sonterra Cap. Master Fund, Ltd. v. UBS AG*

# United States Court of Appeals
## For the Second Circuit

August Term 2023

Argued: April 30, 2024
Decided: September 15, 2025

Nos. 19-2979(L), 19-3187(XAP)

---

SONTERRA CAPITAL MASTER FUND, LTD., on behalf of itself and all others similarly situated, RICHARD DENNIS, on behalf of themselves and all others similarly situated, FRONTPOINT EUROPEAN FUND L.P., on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants-Cross-Appellees*,

v.

UBS AG,

*Defendant-Appellee-Cross-Appellant*,

BARCLAYS BANK PLC, COOPERATIVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., LLOYDS BANKING GROUP PLC, THE ROYAL BANK OF SCOTLAND PLC, JOHN DOES 1-50, BARCLAYS CAPITAL INC.,

*Defendants-Appellees*,

DEUTSCHE BANK AG,

*Defendant.*

Before:   JACOBS, SULLIVAN, and NARDINI, *Circuit Judges*.

Plaintiffs – an individual, an investment fund, and a limited partnership that traded in derivatives based on the Sterling London Interbank Offered Rate ("Sterling LIBOR") – appeal from a judgment of the United States District Court for the Southern District of New York (Broderick, *J.*) dismissing their claims under the Sherman Act and the Commodity Exchange Act (the "CEA") against several banks that allegedly conspired together to manipulate that rate.   The district court concluded that these claims failed for several reasons, including that (1) Sonterra Capital Master Fund, Ltd. and Richard Dennis lacked antitrust standing; (2) FrontPoint European Fund L.P. no longer had litigating capacity and had not assigned its claims to its would-be substitute; and (3) Dennis had failed to plead specific intent with respect to his CEA claims.

We take a more direct road to the same result:   because Plaintiffs have failed to allege actual injury under the Sherman Act or CEA, we **AFFIRM** the judgment of the district court without reaching any other issue.

AFFIRMED.

ERIC F. CITRON (Margaret MacLean, Vincent Briganti, Lowery Dannenberg, P.C., White Plains, NY; Jody Krisiloff, Lovell Stewart Halebian Jacobson LLP, New York, NY; Jamison Diehl, The Law Office of Jamison A. Diehl, New York, NY, *on the brief*), Gupta Wessler LLP, Washington, D.C., *for Plaintiffs-Appellants-Cross-Appellees.*

SETH M. ROKOSKY (Mark A. Kirsch, Eric J. Stock, Jefferson E. Bell, *on the brief*), Gibson, Dunn & Crutcher LLP, New York, NY, *for Defendant-Appellee-Cross-Appellant UBS AG.*

MARC J. GOTTRIDGE (Lisa J. Fried, Herbert Smith Freehills New York LLP, New York, NY; Benjamin A. Fleming, Hogan Lovells US LLP, New York, NY, *on the brief*), ,

Herbert Smith Freehills New York LLP, New York, NY, *for Defendant-Appellee Lloyds Banking Group plc*

Jeffrey T. Scott, Matthew J. Porpora, Sullivan & Cromwell LLP, New York, NY, *for Defendants-Appellees Barclays Bank PLC and Barclays Capital Inc.*

David R. Gelfand, Tawfiq S. Rangwala, Milbank LLP, New York, NY; Mark D. Villaverde, Millbank LLP, Los Angeles, California, *for Defendant-Appellee Coöperatieve Rabobank U.A.*

David S. Lesser, Laura Harris, King & Spalding LLP, New York, NY; G. Patrick Montgomery, King & Spalding LLP, Washington, DC, *for Defendant-Appellee The Royal Bank of Scotland plc (n/k/a NatWest Markets plc).*

RICHARD J. SULLIVAN, *Circuit Judge*:

Plaintiffs – an individual, an investment fund, and a limited partnership[1] that traded in derivatives based on the Sterling London Interbank Offered Rate ("Sterling LIBOR") – appeal from a judgment of the United States District Court for the Southern District of New York (Broderick, *J.*) dismissing their claims under the Sherman Act and the Commodity Exchange Act (the "CEA") against several

---

[1] Plaintiffs are Richard Dennis, Sonterra Capital Master Fund, Ltd. ("Sonterra"), and FrontPoint European Fund, L.P. ("FrontPoint").

banks that allegedly conspired together to manipulate that rate ("the Defendants"). The district court concluded that these claims failed for several reasons, including that (1) Sonterra and Dennis lacked antitrust standing; (2) FrontPoint no longer had litigating capacity and had not assigned its claims to its would-be substitute; and (3) Dennis had failed to plead specific intent with respect to his CEA claims.

We take a more direct road to the same result: because Plaintiffs have failed to allege actual injury under the Sherman Act or CEA, we AFFIRM the judgment of the district court without reaching any other issue.

## I. BACKGROUND

Sterling LIBOR is a benchmark that tracks "the average competitive interest rate at which leading banks [may] borrow in pound sterling (that is, the British pound currency) in London from other banks." J. App'x at 38.[2] This benchmark was "created by Defendants and their trade organization, the British Bankers' Association ('BBA')." *Id.*

---

[2] The facts here are drawn from the Consolidated Amended Class Action Complaint ("CAC"). We accept these facts as true for the purposes of this appeal. *See Vitagliano v. County of Westchester*, 71 F.4th 130, 133 n.3 (2d Cir. 2023).

4

The BBA calculates LIBOR by compiling information regarding interest rates from a "panel" of sixteen banks. Every day, each bank on the panel estimates the interest at which it could borrow pounds sterling in the London interbank market at fifteen different maturities (or "tenors"). The banks then send these quotes to BBA's agent, Thomson Reuters, which identifies and averages the middle fifty percent of estimated interest rates for each tenor. That average "becomes the daily official Sterling LIBOR for that particular tenor and is distributed electronically" through various financial services platforms. *Id.* at 82. Banks submitting Sterling LIBOR quotes agree that they will not collude, coordinate, or give each other advance notice of their LIBOR submissions, and pledge that those submissions will "accurately reflect the average competitive market borrowing rate." *Id.* at 78.

Sterling LIBOR is often used to determine the value of certain derivatives. A derivative is "a contract among two or more parties in which the price or payment term derives from another source." *Id.* at 37. Several of the derivatives at issue in this appeal – including certain foreign exchange forwards, futures contracts traded on the Chicago Mercantile Exchange, and interest-rate swaps – were "priced, benchmarked, and/or settled based on Sterling LIBOR." *Id.* at 83.

Plaintiffs allege that Defendants conspired to manipulate Sterling LIBOR to reap higher profits trading such Sterling LIBOR-based derivatives. According to the CAC, Defendants' traders sent their LIBOR-submission teams electronic messages asking them to present false Sterling LIBOR quotes, which varied upward or downward from the real competitive market rate depending on the traders' positions with respect to Sterling LIBOR-based derivatives. The derivatives teams communicated both internally – with each bank's own respective LIBOR submitters – and externally, with submitters at different banks. To "coordinate their manipulative conduct," Defendants also used inter-dealer brokers, which serve as intermediaries between banks. *Id.* at 99–102. In this way, Defendants conspired to "suppress, inflate, maintain, or otherwise alter Sterling LIBOR." *Id.* at 142.

Plaintiffs assert that this scheme resulted from "a conscious effort by senior management to increase profits," *id.* at 112, and that Defendants facilitated this misconduct by (1) issuing policies that encouraged collusion; (2) altering organizational structures so that their derivatives traders could easily communicate with LIBOR submitters; (3) adopting lax compliance standards; and (4) (in the case of Defendant Deutsche Bank AG) misleading financial regulators

6

in the United Kingdom by concealing the findings of a report criticizing LIBOR manipulation that German authorities had issued. Plaintiffs also allege that Defendants conspired to distort the interest-rate market in other ways, such as by borrowing and lending pounds sterling at above- or below-market rates, and by making false bids and offers regarding the interest that they would be willing to pay or charge (a practice called "spoofing").

Based on this alleged misconduct, Plaintiffs filed a putative class action in the United States District Court for the Southern District of New York. As relevant here, Plaintiffs alleged that Defendants (1) conspired to submit false Sterling LIBOR quotes, engage in other manipulative trading strategies, and restrain trade and fix prices in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 *et seq.*; and (2) rigged the prices of Sterling LIBOR and Sterling LIBOR-based derivatives in violation of sections 6(c), 9, and 22, of the CEA, 7 U.S.C. §§ 9, 13, and 25. Plaintiffs also asserted claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and state common-law claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing. Defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(2)

for lack of personal jurisdiction, and pursuant to Rule 12(b)(6) for failure to state a claim.

The district court issued two orders that together dismissed all of Plaintiffs' claims. In the first, the district court concluded that Sonterra and Dennis lacked antitrust standing. The district court explained that private plaintiffs may not sue under the antitrust laws unless they qualify as "efficient enforcers" whose injuries have a close nexus to the alleged misconduct. And the district court found that, with the exception of FrontPoint, Plaintiffs were not efficient enforcers because they had not bought or sold any derivatives from the Defendants and had suffered only indirect, causally remote damages, which would be difficult to calculate. The district court then dismissed the CEA claims, which only Dennis had ultimately pursued, on the grounds that the statute of limitations barred the claims against some of the Defendants, and that Dennis had not sufficiently pleaded specific intent with respect to the others. The district court also dismissed the RICO claims and most of the state-law claims.[3]

---

[3] We need not reach the state-law claims because Plaintiffs challenge only the district court's dismissal of their Sherman Act and CEA claims on appeal. *See Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 77 n.4 (2d Cir. 2022).

While the motion to dismiss was pending, and before the court issued its first order, Plaintiffs disclosed that FrontPoint had wound down in 2012 – nearly four years before it filed its complaint. After the district court issued its first order, FrontPoint moved to substitute in its place an entity called Fund Liquidation Holdings, LLC ("FLH"), to which FrontPoint had assigned certain rights to sue. The district court then issued a second order, roughly eight months after its first. In that order, the district court concluded that FrontPoint did not assign FLH the right to bring the remaining Sherman Act and state-law claims against UBS AG ("UBS"), and that FrontPoint lacked the capacity to sue in its own name. It accordingly dismissed the last surviving claims.

Plaintiffs timely appealed, and UBS timely cross-appealed.

## II. STANDARD OF REVIEW

We review *de novo* a district court's dismissal for failure to state a claim, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff." *In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 142 (2d Cir. 2023). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation

9

marks omitted). A claim is plausible if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and establishes "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A bare bones statement of conspiracy or of injury under the antitrust laws" will not get a plaintiff past a motion to dismiss. *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 398 (2d Cir. 2024) (internal quotation marks omitted).

## III.   DISCUSSION

The district court dismissed Plaintiffs' antitrust claims for several different reasons, including that Sonterra and Dennis are not efficient enforcers of the antitrust laws, that FrontPoint did not assign its claims to FLH, and that Dennis failed to plead specific intent with respect to his CEA claims. But a more straightforward route leads to the same result, and "[w]e are free to affirm on any ground that finds support in the record, even if it was not the ground upon which the trial court relied." *Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Machines Corp.*, 110 F.4th 106, 113 (2d Cir. 2024) (internal quotation marks omitted). Because we conclude that none of the Plaintiffs has alleged an antitrust or CEA injury, we affirm.

## A.    Antitrust Claims

Section 4 of the Clayton Act entitles any person who has been "injured in [their] business or property by reason of anything forbidden in the antitrust laws," including the Sherman Act, to seek treble damages.   15 U.S.C. § 15(a).   Because "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation," this private right of action has "developed limiting contours, which are embodied in the concept of antitrust standing."   *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115 (2d Cir. 2021) (internal quotation marks omitted).   "Like constitutional standing, antitrust standing is a threshold inquiry resolved at the pleading stage."   *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016).   To survive that inquiry, plaintiffs must show that (1) they have suffered "a special kind of 'antitrust injury,'" and (2) they are "'efficient enforcer[s]' to assert a private antitrust claim."   *Port Dock & Stone Corp. v. Oldcastle, Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007).

Courts use a "three-step process" to determine whether plaintiffs have sufficiently alleged antitrust injury.  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).   "[F]irst the plaintiff must identify the practice

complained of and the reasons such a practice is or might be anticompetitive; then the court must identify the actual injury the plaintiff alleges by looking to the ways in which the plaintiff claims it is in a worse position as a consequence of defendant's conduct; and finally, the court must compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018) (alterations accepted and internal quotation marks omitted). Under this test, plaintiffs thus must identify both the type of anticompetitive conduct at issue and an "actual injury" that put them "in a worse position." *Id.*

Plaintiffs have failed to make the second showing. While Plaintiffs allege that Defendants colluded to set "artificial prices," J. App'x at 79, they do not identify any specific transactions where they suffered financial harm because Defendants' price-fixing had distorted the market, *see id.* at 128–35, 141–46. Considering that the calculation of Sterling LIBOR used only the middle fifty percent of sixteen daily reports from different banks, Plaintiffs do not plausibly allege that a single manipulated report would have affected the final published rate and thereby would have had potential to cause Plaintiffs harm. And even assuming that Defendants successfully manipulated the official rate on a given

12

day, Plaintiffs do not explain how that rate being lower or higher caused them to suffer financial harm under the terms of the particular derivative contracts they held. Indeed, the facts alleged in the complaint are equally consistent with Plaintiffs *benefiting* from the alleged scheme, which sometimes inflated Sterling LIBOR, sometimes deflated it, and sometimes held it steady, depending on any given date or time.

Our CEA jurisprudence shows how to assess injury in cases involving such multidirectional market manipulation.[4] In *Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.*, the plaintiff brought CEA claims against defendants who had allegedly engaged in a "spoofing" scheme to rig the price of futures contracts for precious metals by placing thousands of false offers and bids over the course of several years. 41 F.4th 71, 75–76 (2d Cir. 2022). We affirmed the district court's dismissal of the complaint, explaining that the plaintiff's allegations did not "support a reasonable inference that Defendants' spoofing conduct injured it," because "spoofing can artificially move the market in *either* direction" and it was "not at all clear whether – even assuming that [the plaintiff] was affected by

---

[4] Just as the Clayton Act requires a putative plaintiff to have been "injured in his business or property," 15 U.S.C. § 15(a), the CEA creates a right to sue only for plaintiffs who have alleged "actual damages," 7 U.S.C. § 25(a)(1).

13

Defendants' spoofing scheme – [the plaintiff] incurred a net loss or a net benefit from it."   *Id.* at 78–79.

The same is true here.   Because the alleged scheme went both ways, sometimes elevating and sometimes depressing LIBOR, "it is not at all clear" that Plaintiffs suffered any injury.   *Id.* at 79.   In cases of such sporadic and multidirectional manipulation, a CEA or antitrust plaintiff may not "alleg[e] conclusorily that there must have been at least one trade – though it has no idea which one or when it may have occurred – in which it came out on the net losing end of Defendants' market manipulation."   *Id.* at 78.   Instead, a plaintiff must "plead additional facts to make it plausible that the impact on her was harmful rather than neutral or beneficial."   *Total Gas*, 889 F.3d at 113.

In an effort to distinguish *Gamma Traders*, Plaintiffs seize upon a line of that opinion in which we remarked that "antitrust law [was] inapposite" given the facts of that case.   *Gamma Traders*, 41 F.4th at 79.   But Plaintiffs take that quotation out of context.   We reached that conclusion only after explaining that a run-of-the-mill "price-fixing conspiracy aims to consistently push the market price in a single direction, whereas . . . spoofing can artificially move the market in *either* direction, and yesterday's market sellers can become tomorrow's market buyers."   *Id.*

Unlike the standard price-fixing scheme alluded to in *Gamma Traders,* the scheme asserted here involved precisely the sort of multidirectional manipulation alleged in that case. As a result, it is "not at all clear whether . . . [Plaintiffs] incurred a net loss or a net benefit from" Defendants' alleged market manipulation. *Id.*

Plaintiffs also argue that we took a more lenient approach to antitrust injury in *Gelboim*. There, we held that the plaintiffs successfully pleaded antitrust injury by alleging that a group of defendant banks "colluded to depress LIBOR, and thereby increased the cost to [plaintiffs], as buyers, of various LIBOR-based financial instruments, a cost increase reflected in reduced rates of return." *Gelboim*, 823 F.3d at 771. On Plaintiffs' reading, *Gelboim* instructs that antitrust plaintiffs need allege only that they bought assets in a market distorted by an anticompetitive scheme. To support this interpretation, Plaintiffs rely on our statement that "when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer [antitrust injury]." *Id.* at 772.

But Plaintiffs misconstrue *Gelboim*. There, we emphasized that the plaintiffs had "sustained their burden of showing injury by alleging that they paid artificially fixed *higher* prices." *Id.* at 777 (emphasis added). Those plaintiffs

could plausibly allege this harm because the defendants had uniformly and consistently "*depress[ed]* LIBOR," which necessarily "reduced [plaintiffs'] rates of return." *Id.* at 771 (emphasis added). By contrast, this case involves opportunistic, fluctuating manipulations that may have sometimes marginally propped Sterling LIBOR up and may have sometimes marginally suppressed it. While we might reasonably infer, at the motion-to-dismiss stage, that an antitrust plaintiff has suffered some sort of pecuniary harm in a case involving unidirectional market manipulation, that inference becomes unreasonable when the alleged conduct both inflated and deflated prices. *See Gamma Traders*, 41 F.4th at 78–79.

## B. CEA Claims

Dennis's CEA claims fail for the same reason. Because the CEA requires "actual damages," 7 U.S.C. § 25(a)(1), a CEA plaintiff "must plausibly allege (1) that []he transacted in at least one commodity contract at a price that was lower or higher than it otherwise would have been absent the defendant's manipulations, and (2) that the manipulated prices were to the plaintiff's detriment." *Total Gas*, 889 F.3d at 112. Here, Dennis has failed to make this showing: instead, the complaint alleges only that Dennis did business in a market where prices were

16

sometimes "artificial," J. App'x at 148, without pointing to any transaction where he lost money because of Defendants' scheme. Indeed, Dennis fails to establish that, on the whole, the effect of Defendants' manipulation was not neutral or positive for him.

As discussed above, we rejected a near-identical theory of CEA liability in *Gamma Traders*. As we explained then, "[t]he CEA does not deputize traders to rove the commodities markets hunting for bad behavior," and a plaintiff may not simply "theorize[] that its regular participation in the relevant commodities markets supports an inference that it was injured by Defendants' [manipulation] at least once." *Gamma Traders*, 41 F.4th at 82. Such a principle "would permit any regular market participant to proceed to discovery any time a significant market player has repeatedly committed fraud," and would "contravene[]" both the CEA's requirement of "actual damages," 7 U.S.C. § 25(a)(1), and our caselaw. *Gamma Traders*, 41 F.4th at 82. "There are no citizens' arrests for commodities fraud," and the CEA tasks regulators, not investors, with protecting the public's interests – as the Commodity Futures Trading Commission and Department of Justice did here. *Total Gas*, 889 F.3d at 109–10.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court dismissing the federal claims. Having resolved the main appeal in Defendants' favor, we dismiss UBS's cross-appeal as moot. *See Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144, 158–59 (2d Cir. 2021).